1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

Daniel P. Taber,

            Plaintiff,

    v.

Exemplar Holdings, LLC,

            Defendant.

Case No. 2:23-cv-00670-BNW

**ORDER**

10    This is a contract dispute between old friends over an unsuccessful business venture. After

11  Defendant allegedly failed to compensate Plaintiff for the years he spent working on a project,

12  Plaintiff—almost six years after the parties' falling out—brought this claim for breach of

13  contract. The parties cross-move for summary judgment, and the Court must ultimately decide

14  whether Plaintiff's claim is time barred. Because Defendant did not meet its burden to show that

15  Plaintiff's claim is entirely time barred, and because Plaintiff showed that there is a genuine

16  dispute of material fact as to whether his claim is partially time barred, the Court denies

17  Defendant's motion for summary judgment (ECF No. 25), and it grants Plaintiff's motion for

18  partial-summary judgment (ECF No. 33).

19    **I.    BACKGROUND**

20    Plaintiff met Gregory Orman, the sole member and manager of Defendant Exemplar

21  Holdings, LLC, in 1992 through a mutual friend. ECF No. 31 at 3; ECF No. 25 at 4. At the time

22  they met, Plaintiff was a business attorney. ECF No. 25 at 3. For the next fifteen years or so,

23  Plaintiff represented Mr. Orman and his entities in several legal matters. ECF No. 31 at 4; ECF

24  No. 25 at 3. According to Plaintiff, this business relationship developed into a personal

25  friendship. ECF No. 31 at 5.

26    **A.    The screw project begins.**

27    In 2012, Mr. Orman called Plaintiff about a project he was working on. ECF No. 25 at 3;

28  ECF No. 31 at 7. Mr. Orman believed that he could manufacture a generic pedicle screw (a screw

used by surgeons in spinal fixation procedures) and sell it at a far lower price. ECF No. 25 at 3;
ECF No. 31 at 7–8. He wanted Plaintiff to verify his idea through a feasibility study. ECF No. 25
at 3; ECF No. 31 at 8. From October 2012 through July 2013, Plaintiff worked on the feasibility
study for $2,500.00 per month. ECF No. 25, Ex. 4-A at 12.

In July 2013, Plaintiff, Mr. Orman, and Christian Moore (a consultant working for
Defendant) met in Kansas to discuss the screw project. The parties wanted to develop a low-cost
pedicle screw that they could sell in the United States (which would require FDA approval). ECF
No. 25 at 3; ECF No. 31 at 10–11. At this meeting, the parties worked on a budget and project
goals for August 2013 through October 2013. ECF No. 31, Ex. 7. The budget included a
$30,000.00 allotment for Plaintiff. *Id.* While Defendant states that Mr. Orman, Mr. Moore, and
Plaintiff only verbally agreed to move forward with the screw project, Plaintiff states that Mr.
Orman signed the budget/goal document, and then took it with him. ECF No. 25 at 3; ECF No. 31
at 10.

### B. Plaintiff requests an employment-verification letter.

In 2015, Plaintiff began house-hunting. ECF No. 31 at 14. His realtor suggested that
Plaintiff obtain an employment-verification letter from Defendant to support his loan application.
*Id.* So, Plaintiff emailed Mr. Moore: "I've attached an employment verification statement that's
accurate as to my terms of employment, if you think anything is remiss please give me a call,
otherwise if you could put this on company letterhead, sign and pdf it to me that would be greatly
appreciated." *Id.*, Ex. 14.

In response, Mr. Moore signed the letter and used Exemplar Medical, LLC, letterhead. *Id.*,
Ex. 16. The employment-verification letter is dated November 5, 2015. *Id.* It states that Plaintiff
"has been working part-time as an independent contractor . . . since 2012. [Plaintiff] has been
working full-time on behalf of Exemplar on a spinal implant project since July 2013, and
continuing to date." *Id.* It further states: "[Plaintiff's] compensation was $2,500 per month from
October 2012 through July 2013. From August 2013 through September 2013 his compensation
was $10,000 per month. From October 2013 and continuing to date, [Plaintiff's] agreed-upon

compensation has been $7,500 per month." *Id.* Finally, the letter provided that Plaintiff was reimbursed for certain pre-approved expenses relating to the screw project. *Id.*

## C. The screw project ends.

According to Plaintiff, there were continued delays in securing pedicle screws ready for ASTM 1717 testing.[1] ECF No. 31 at 11. Per an email exchange between Mr. Orman and Plaintiff, however, the pedicle screws were ready for testing sometime before February 10, 2017. *Id.*, Ex. 11. In that same email, Mr. Orman asked Plaintiff about personnel costs to complete the ASTM 1717 testing and file the 510(k) application. *Id.* Plaintiff estimated the cost to be $15,000-$22,500. *Id.* Both parties are silent as to what transpired, if anything, between February 2017 and April 2017.

On April 29, 2017, Mr. Orman sent Plaintiff an email detailing what he was "willing to do to get the pedicle screw system through a 510k [sic] application. It's based on the dialogue we've had over the past three weeks." ECF No. 31 at 13; ECF No. 1, Ex. 2. Mr. Orman offered Plaintiff four payments of $5,000 contingent on meeting certain goals. ECF No. 1, Ex. 2. Mr. Orman further offered equity to Plaintiff upon receipt of 510(k) approval of the pedicle screws. *Id.*

Plaintiff viewed this email as a renegotiation of his contract with Defendant. In an email to Mr. Moore in May 2017, Plaintiff said: "[Mr. Orman's] email sent Saturday, April 29, 2017, in seeking to re-negotiate my past compensation, effectively terminated my at-will employment at the agreed rate of $7,500 per month plus expenses." ECF No. 31 at 13, Ex. 12. Plaintiff attached his expense report and payment history to this email.

## D. The relevant procedural history.

Plaintiff filed his complaint on April 28, 2023. ECF No. 1. He attached a "Payment History" chart to the complaint. *Id.*, Ex. 3. The payment-history chart included the following columns: work period, date due, amount due, amount paid, date paid, balance due. *Id.* The amount due reflects Plaintiff's monthly compensation, and the balance due accrues each month.

---

[1] "The FDA generally approves any pedicle screws that pass ASTM 1717 testing, since that means they are 'substantially equivalent' to those previously approved for sale." ECF No. 31 at 11.

1  *See id.* According to the chart, Defendant sporadically paid Plaintiff during his employment with

2  the company. Plaintiff also attached an expense report to the complaint. *Id.*, Ex. 4.

3        Defendant filed its motion for summary judgment on June 25, 2024. ECF No. 25. Plaintiff

4  opposed and Defendant replied. ECF Nos. 30 and 32. Plaintiff filed his motion for partial

5  summary judgment on November 15, 2024. Defendant opposed and Plaintiff replied. ECF Nos.

6  36 and 37.

7  **II.    DISCUSSION**

8        In their cross-motions for summary judgment, the parties focus on three overarching

9  issues: (1) whether there is an instrument in writing such that Nevada's six-year statute of

10  limitations applies; (2) whether this cause of action accrued outside of Nevada such that the

11  state's borrowing statute applies; and (3) whether the parties' contract was an installment contract

12  such that the majority of Plaintiff's claim is time-barred. Although the parties do not brief the

13  choice-of-law issues here, this Court considers the choice-of-law issues before addressing the

14  three remaining questions.

15  **A.  Summary-judgment standards.**

16        Under Federal Rule of Civil Procedure 56, summary judgment is proper when the movant

17  demonstrates that the materials in the record show "that there is no genuine dispute as to any

18  material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

19  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby,*

20  *Inc.*, 477 U.S. 242, 248–49 (1986). A dispute as to material fact is genuine if there is sufficient

21  evidence for a reasonable jury to find for the non-moving party. *Id.* at 248. A principal purpose of

22  summary judgment "is to isolate and dispose of factually unsupported claims or defenses."

23  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

24        In resolving summary-judgment motions, courts apply a burden-shifting analysis. When a

25  party moving for summary judgment will have the burden of proof on an issue at trial, such as

26  when the movant is asserting an affirmative defense, then the movant "must affirmatively

27  demonstrate that no reasonable trier of fact could find other than for the moving party."

28  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, when the non-

moving party will have the burden of proof at trial, the moving party can meet its burden in two ways. First, the moving party may present evidence that negates an essential element of the non-moving party's case. Or, second, the moving party may demonstrate that the non-moving party failed to make a sufficient showing of an essential element of that party's case. *Celotex*, 477 U.S. at 323–24. If the moving party fails to carry this burden, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

However, if the moving party meets its initial burden, then the burden shifts to the non-moving party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). While the non-moving party need not establish a material issue of fact conclusively in its favor, it cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A "scintilla of evidence" or "some metaphysical doubt" is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).

Importantly, courts should not weigh the evidence or excavate the truth but, rather, determine whether there is a genuine issue of material fact for trial. *See Anderson*, 477 U.S. at 249. Additionally, courts must draw all justifiable inferences in favor of the non-moving party. *Id.* at 255. Despite this, courts may grant summary judgment if the evidence of the non-moving party is merely colorable or not significantly probative. *See id.* at 249–50.

When both parties file motions for summary judgment, courts must judge each motion on its own merits. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). However, courts should not decide each motion in a vacuum. *See id.* at 1135–1136. That is, courts "must consider the appropriate evidentiary material identified and submitted

in support of both motions, and in opposition to both motions, before ruling on each of them." *Id.* at 1134.

## B. Choice-of-law issues.

The Court has diversity jurisdiction over this action. *See* 28 U.S.C. § 1332(a). When a federal court exercises diversity jurisdiction, it applies the substantive law of the forum in which the court sits, including the forum's choice-of-law rules. *First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153 (9th Cir. 2015) (citing *Ins. Co. of North Am. v. Fed. Express Corp.*, 189 F.3d 914, 919 (9th Cir. 1999)).

To determine which statute of limitations applies in contract cases, Nevada follows the "classical rule" and uses its own law.[2] *Sierra Diesel Injection Serv. v. Burroughs Corp., Inc.*, 648 F. Supp. 1148, 1152 (D. Nev. 1987) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)); *Wilcox v. Williams*, 5 Nev. 206, 212 (1869) ("[N]o matter where the contract was made, the Statute of Limitations of the forum govern the remedy"). Relying on this same rationale, the Court previously applied Nevada's statute of limitations when it granted in part and denied in part Defendant's motion to dismiss. ECF No. 18. The Court will do the same here.[3]

//

---

[2] It is not clear whether Defendant is also asserting the need to embark upon a choice-of-law analysis regarding the formation/enforceability of a contract. If so, Defendant provides no legal argument as to whether there is a true conflict, and if so, whether Nevada, Kansas, or California law applies to Plaintiff's breach-of-contract claim. The Court declines to manufacture arguments for Defendant and, instead, analyzes only the choice-of-law issue as it applies to the statute of limitations. *See Hibbs v. Dep't of Hum. Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (denying relief based on argument that was "too undeveloped to be capable of assessment"); *see also United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (refusing to "manufacture" an argument for a party that was inadequately briefed and lacked any citations to authority). Even if the Court were to consider Defendant's argument as it stands, Defendant has not met its burden. As the moving party who will not bear the burden of proof at trial, Defendant has the initial burden of either (1) presenting evidence to negate an essential element of Plaintiff's case; or (2) demonstrating that Plaintiff failed to make a showing sufficient to establish an element essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Here, Defendant attempts the latter route by arguing that "Plaintiff cannot satisfy his burden" because there is no evidence of a written contract. ECF No. 26 at 5. But Defendant has not established which law would govern the formation/enforceability of the contract. Consequently, Defendant has not demonstrated why Plaintiff's proffered evidence is insufficient to constitute an enforceable contract.

[3] The Court notes that, in addition, both parties cite Nevada's statute of limitations in their arguments and do not address why a different state's statute of limitations should apply.

**C.  Nevada's six-year statute of limitation applies and does not bar the claim because there is an instrument in writing.**

### 1.  The parties' arguments.

In its motion for summary judgment, Defendant argues there is no written contract between it and Plaintiff and that, as a result, the statute of limitations is four years.[4] ECF No. 26 at 5. Plaintiff responds that he has produced a written agreement—an employment-verification letter—which shows there is a written contract. ECF No. 30 at 12–13. Defendant replies that the employment-verification letter is not an employment agreement. ECF No. 32 at 4.

The parties continue to argue these points in the briefings related to Plaintiff's motion for partial-summary judgment. In its opposition, Defendant maintains that Plaintiff has not presented evidence of a written agreement. ECF No. 36 at 2. Plaintiff replies that Defendant ignores the language in NRS § 11.190(b), in which the six-year statute of limitations applies to obligations or liabilities "founded upon an instrument in writing." ECF No. 37 at 1–2.

### 2.  Defendant has not met its initial burden because the employment-verification letter is an instrument in writing under NRS § 11.190.

The Court finds that Defendant has not met its initial burden to show that Plaintiff has not presented evidence of an "instrument in writing" under NRS § 11.190(1)(b). Defendant is the moving party, and because this argument relates to the statute of limitations, Defendant bears the burden of proof at trial. "An assertion of the statute of limitations is an affirmative defense, and under Nevada law, the defendant bears the burden of proof for affirmative defenses." *Fireman's Fund Ins. Co. v. Sloan Valve Co.*, No. 2:10-CV-01816-MMD, 2013 WL 76264, at *1 (D. Nev. Jan. 3, 2013) (citing NRCP 8(c)) (citing *Schwartz v. Schwartz*, 591 P.2d 1137, 1140 n.2 (Nev. 1979)). Accordingly, Defendant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

The Nevada Supreme Court addressed the instrument-in-writing language in *El Ranco, Inc. v. New York Meat & Provision Co.*, 493 P.2d 1318 (Nev. 1972). Upon reviewing the history

---

[4] *Compare* Nev. Rev. Stat. § 11.190(1)(b) (six-year statute of limitations applies to contracts founded upon an instrument in writing), *with* Nev. Rev. Stat. § 11.190(2)(c) (four-year statute of limitations applies to contracts not founded upon an instrument in writing).

of the statutory language, the court stated: "The peculiar language of NRS 11.190(1)(b) is derived from a California statute adopted in 1850 . . . the statute is not limited to actions upon 'contracts in writing,' but relates to any obligation or liability founded upon an instrument of writing." *Id.* The court went on to explain:

> Under our statute, as interpreted by authorities that have concerned themselves with the same language, all that is required is that there be a writing which fairly imports the obligation to pay. This is a fair construction of the statute, consistent with its language and with the legislative purpose to allow a longer time to commence an action for which there is solid written proof. In the absence of signed documentation, our ruling may be different, and such situation will be considered when it arises.

*Id.* at 1321–22. The Nevada Supreme Court ultimately concluded that signed sales receipts constituted an instrument in writing because they showed an obligation to pay. *Id.* at 1321.

Here, a reasonable trier of fact could find that the employment-verification letter constitutes an instrument in writing under NRS § 11.190(1)(b). The letter states that Plaintiff "has been working as an independent contractor on behalf of Exemplar Wealth Management, LLC, Exemplar Holdings, LLC, and/or Exemplar Medical, LLC (limited liability companies organized pursuant to the laws of the State of Kansas, hereinafter referred to as 'Exemplar')."[5] ECF No. 1, Ex. 1. It explains that Plaintiff has been working full time for Defendant since July 2013 and "continuing to date [November 5, 2015]." *Id.* It provides that his official title is Director of Exemplar Medical, LLC, and that he works on daily operations related to Exemplar's spinal implant project. *Id.* According to the letter, Plaintiff's compensation was $2,500 per month from October 2012 through July 2013, $10,000 per month from August 2013 through September 2013, and $7,500 per month from October 2013 to the date of the letter (November 5, 2015). *Id.*

---

[5] Defendant argues that *El Ranco* is distinguishable because the instant employment-verification letter shows that Plaintiff had a contract with Exemplar Medical, LLC, and not Exemplar Holdings, LLC (Defendant). ECF No. 32 at 5. While the letter is on Exemplar Medical, LLC, letterhead and names Plaintiff as Director of Exemplar Medical, LLC, the letter also states that Plaintiff has been working as an independent contractor on behalf Defendant Exemplar Holdings, LLC, as well as other Exemplar LLCs. Moreover, the letter is signed by a person "for Exemplar," which, as noted in the letter itself, includes Defendant Exemplar Holdings, LLC. As a result, Defendant cannot show that "no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

1  Plaintiff was also entitled to pre-approved expenses relating to the screw project. *Id.* Lastly,

2  Christian Moore signed the letter, and under his signature it says, "For Exemplar." *Id.*

3  Based on these details—salary, title, work periods, expenses, signature—a reasonable trier

4  of fact could conclude that the letter "fairly imports" an obligation for Defendant to pay Plaintiff

5  for his work on the screw project. Moreover, the letter comports with the legislative purpose

6  behind the statute "to allow a longer time to commence an action for which there is solid written

7  proof." *El Ranco, Inc. v. New York Meat & Provision Co.*, 493 P.2d 1318, 1321–22 (Nev. 1972).

8  In sum, this Court will not conclude that Plaintiff's claim is time-barred under NRS § 11.190(1(b)

9  because Defendant has not shown that this contract is an oral contract governed by the four-year

10  statute of limitations.

11  **D.  Nevada's borrowing statute does not apply because this cause of action accrued in Nevada.**

12  **1.  The parties' arguments.**

13  In its motion for summary judgment, Defendant argues that Plaintiff's claim is barred by

14  Nevada's borrowing statute (NRS § 11.020) because his claim arose outside of Nevada and

15  therefore the six-year statute of limitations does not apply. ECF No. 25 at 6. Plaintiff disagrees.

16  ECF No. 30 at 3–4. In sum, the parties dispute whether the Court should look to Defendant's

17  place of incorporation or principal place of business to determine whether the cause of action

18  arose in Nevada. Plaintiff filed a motion for partial-summary judgment on this point. ECF No. 33.

19  Defendant opposed (ECF No. 36), and Plaintiff replied (ECF No. 37).

20  Regarding the motion for summary judgment, Defendant is the moving party. Because its

21  argument relates to the statute of limitations, it bears the burden of proof at trial. *See Fireman's*

22  *Fund Ins. Co. v. Sloan Valve Co.*, No. 2:10-CV-01816-MMD, 2013 WL 76264, at *1 (D. Nev.

23  Jan. 3, 2013). Accordingly, Defendant "must affirmatively demonstrate that no reasonable trier of

24  fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

25  984 (9th Cir. 2007).

26  Regarding the motion for partial-summary judgment, Plaintiff is the moving party.

27  Because Plaintiff will not have the burden of proof at trial, he can meet his initial burden in two

28  ways: (1) by negating an essential element of Defendant's case; or (2) by demonstrating that

1   Defendant failed to make a sufficient showing of an essential element of that party's case. *Celotex*

2   *Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

3       **2.   The question before the Court: where does a defendant corporation reside for purposes of Nevada's borrowing statute?**

4       Like many states, Nevada has a borrowing statute to prevent forum shopping.[6] *Flowers v.*

5   *Carville*, 310 F.3d 1118, 1125 (9th Cir. 2002) (recognizing "that the Nevada legislature sought to

6   balance the purpose of avoiding forum shopping against that of keeping litigation options open

7   for its citizens"). Nevada's borrowing statute states:

8       When a cause of action has arisen in another state, or in a foreign country, and by the laws

9       thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against the person in this State,

10      except in favor of a citizen thereof who has held the cause of action from the time it accrued.

11  Nev. Rev. Stat. § 11.020. This statute bars a plaintiff's claim when (1) the plaintiff is not a

12  Nevada citizen; (2) the cause of action arose in a different state; and (3) the cause of action would

13  be barred in that state. *See id.* Here, the parties only dispute whether Plaintiff's claim arose in

14  Nevada.

15      It has been many years since the Nevada Supreme Court addressed where a contract

16  action arises for purposes of the borrowing statute. In *Lewis v. Hyams*, the court established that a

17  contract action arises in the place where the defendant can be sued, which at the time those cases

18  were decided, meant where the defendant resided. *Lewis*, 63 P. 126, 127 (Nev. 1900). The court

19  affirmed this decision in *Wing v. Wiltsee*, 223 P. 334, 335–36 (Nev. 1924). However, *Lewis* and

20  *Wing* dealt with natural persons, not corporations. Thus, the Nevada Supreme Court has not

21  addressed the issue before this Court: where does a defendant corporation reside for purposes of

22  Nevada's borrowing statute?

23      Defendant argues that a corporation resides where it has its principal place of business.

24  ECF No. 25 at 7. It cites three non-binding cases in support of this proposition. *Id.* Plaintiff

25  responds that a corporation resides where it is incorporated. ECF No. 30 at 3. Plaintiff relies on

26  the Ninth Circuit's reasoning in *Alberding v. Brunzell* and a law review article. *Id.* at 4–8.

27

28    [6] As explained in Section II.B., this Court applies Nevada's statute of limitations.

In the briefings on Plaintiff's motion for partial-summary judgment, the parties go on to dispute whether Defendant's principal place of business is Kansas. *See* ECF No. 33 at 4–5; ECF No. 36 at 3–4; ECF No. 37 at 3.

This Court must predict how the Nevada Supreme Court would decide the issue if this case were before it. "In the absence of controlling forum state law, a federal court sitting in diversity must use its own best judgment in predicting how the state's highest court would decide the case. In so doing, a federal court may be aided by looking to well-reasoned decisions from other jurisdictions." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) (citations omitted); *see also U.S. v. Bibbins*, 637 F.3d 1087 (9th Cir. 2011) (looking to decisions in other jurisdictions in the absence of Nevada law). As explained below, this Court predicts the Nevada Supreme Court would determine that a defendant corporation resides in the place where it is incorporated for purposes of Nevada's borrowing statute.

### 3. This Court predicts that the Nevada Supreme Court would apply the place-of-incorporation test.

The Court begins with the Nevada Supreme Court's closely related caselaw on the issue. In *Lewis v. Hyams*, the Nevada Supreme Court considered whether a contract action was time-barred under Nevada's borrowing statute. 63 P. 126, 126–27 (Nev. 1900). Plaintiff, a resident of New York, sued defendants, residents of California, for breach of a promissory note that the parties executed in California. In concluding that the claim was time-barred because it accrued in New York, the Nevada Supreme Court reasoned that New York was:

> his place of residence; the place where any competent court of New York could, by its process, have acquired jurisdiction of his person; the place where the respondent's claim against the appellant could have been enforced; the place where the respondent had the right to institute and carry through an action against the appellant; and the place where the respondent could have prosecuted the action against the appellant with effect.

*Id.* at 128. The court went on to state that "the cause of action accrues in any state against the defendant where he may be found." *Id.* The court later affirmed this holding in *Wing v. Wiltsee*, 223 P. 334, 336 (Nev. 1924) ("We think the conclusion reached in the Lewis Case . . . [is] based upon sound reasoning.").

Almost eighty years later, in *Alberding v. Brunzell*, the Ninth Circuit considered whether a district court properly applied Nevada's borrowing statute. 601 F.2d 474, 476–77 (9th Cir. 1979).

The appellants argued that the Nevada rule, in which a contract claim arises where the defendant resides, was outmoded given the modern developments in personal jurisdiction. *Id.* at 477. They argued that Nevada should borrow the statute of limitations of the place with the most significant contacts. In rejecting this argument, the Ninth Circuit commented that the significant-contacts test is known to be "ambiguous" if not "entirely unworkable," particularly in contract cases. *Id.* (citing A. Ehrenzweig, Conflict of Laws 430 (1962)).

In contrast, the Ninth Circuit observed that the place-of-residence test is mechanical. Though the Ninth Circuit acknowledged that the appellants' analysis regarding modern personal jurisdiction was "sensible," it adhered to Nevada's place-of-residence test because it was on point and had contemporary justification. *Id.* at 478. "[W]e cannot conclude that the old Nevada rule is so without usefulness that we can assert with confidence that Nevada state courts would reject it if given the chance." *Id.* at 477.

The opinions in *Lewis* and *Alberding* make clear that the Nevada Supreme Court chose the place-of-residence test for jurisdictional reasons. The rationale "behind the rule was that a cause of action arises in the place where the defendant can be sued, and at the time those cases were decided, personal jurisdiction could only be obtained in the state of residence." *Id.* (citing *Lewis v. Hyams*, 63 P. 126, 127 (Nev. 1900)). Both the place-of-incorporation and principal-place-of-business tests align with the purpose behind Nevada's accrual test: jurisdiction.[7] *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (citing Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 728 (1988)).

However, in the above-cited article, which Plaintiff also refers to, Professor Brilmayer persuasively argues:

---

[7] The Court disagrees with Defendant's statement that personal jurisdiction is "wholly irrelevant" to the place-of-accrual issue. *See* ECF No. 32 at 7; ECF No. 36 at 5. The Nevada Supreme Court in *Lewis* determined that the cause of action accrues in the place where the defendant resides because that is where the court has jurisdiction over him. *Lewis v. Hyams*, 63 P. 126, 127 (Nev. 1900); *see also Alberding v. Brunzell*, 601 F.2d 474, 477 (9th Cir. 1979).

The law treats corporations like legal persons, and the place of incorporation and the principal place of business are both analogous to domicile. In some respects, the decision to incorporate in a particular state provides a more powerful basis for adjudicatory jurisdiction than does domicile. First, the corporation intentionally chooses to create a relationship with the state of incorporation, presumably to obtain the benefits of that state's substantive and procedural laws. Such a choice creates a unique relationship that justifies general jurisdiction over the corporation. Second, the corporation, unlike an individual, cannot ever be absent from the state of incorporation. Third, even if a corporation neither does business nor maintains an office in the incorporating state, the incorporation process itself provides notice of the potential for judicial jurisdiction. . . .

The principal place of business standard may rest on conceptual grounds similar to those supporting the state of incorporation as a jurisdictional basis. This standard, however, incurs definitional and functional problems of application similar to those occurring with the domicile test.

Brilmayer et al., A General Look at General Jurisdiction, 66 Texas L. Rev. 721, 733 (1988). The place-of-incorporation test's strong adjudicatory basis and straightforward application seems to comport more closely with the rationales in *Lewis* and *Alberding*. The *Lewis* opinion based its accrual test on where the defendant could be sued. *Lewis v. Hyams*, 63 P. 126, 128 (Nev. 1900). And the *Alberding* opinion found justification in the *Lewis* test as "simple" and "mechanical" compared to the "ambiguous" if not "entirely unworkable" competing test (significant contacts). *Alberding v. Brunzell*, 601 F.2d 474, 477 (9th Cir. 1979). Given the relevant caselaw before it, and in the absence of more recent and persuasive authority, this Court predicts that the Nevada Supreme Court would choose the place-of-incorporation test because it is simpler than the principal-place-of-business test and provides an equally strong—if not stronger—basis for adjudicatory jurisdiction.[8]

/ /

---

[8]  The facts of this case further illustrate why the place of incorporation is likely a stronger basis for adjudicatory jurisdiction. Plaintiff struggled to determine where to sue Defendant. He ultimately sued Defendant in Nevada because that was its only known residence at the time. As Defendant admitted, it did not file with the office of the Secretary of State of Kansas to obtain authority to do business in Kansas between 2009 and 2023. ECF No. 33-1 at 13. It relocated offices in 2020 and 2021 but appeared to list an outdated address in its filing with the office of the Nevada Secretary of State on December 31, 2021. ECF No. 36 at 3; ECF No. 31 at 18. Plaintiff served Defendant via its registered agent in Reno, Nevada. ECF No. 11. As Plaintiff summed up in his opposition to Defendant's motion for summary judgment: "With no known place of business, and without even knowing whether Defendant was still an operating entity, Plaintiff commenced this action in the State where Defendant was organized, which was not only the known residence of Defendant for purposes of obtaining personal jurisdiction, but also the only place that Plaintiff could be assured of having personal jurisdiction over Defendant." ECF No. 30 at 7.

1

### 4. Defendant's cited cases applying the principal-place-of-business test are unpersuasive.

2

The Court is not persuaded otherwise by Defendant's proffered authority. Defendant cites

3

three, non-binding cases for the proposition that courts consistently determine a corporation's

4

residence by its principal place of business in the context of borrowing statutes. ECF No. 25 at 7–

5

8; ECF No. 36 at 4. The first two cases apply New York's borrowing statute and law, which, as

6

discussed below, differs significantly from the law in Nevada.

7

In the first case, *EMC Mortgage LLC v. Pulte Mortgage LLC*, the United States District

8

Court for the District of Colorado considered the defendant's motion to dismiss the plaintiff's

9

claims as time barred under New York's borrowing statute. 441 F. Supp. 3d 1140, 1151 (D. Colo.

10

2020). The court noted that, under New York law, "[w]hen an alleged injury is purely economic,"

11

a cause of action accrues "where the plaintiff resides and sustains the economic impact of the

12

loss." *Id.* (citing *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 482 (N.Y. 1999)). "Courts

13

applying the borrowing statute 'have consistently held that a business entity's residence is

14

determined by its principal place of business.'" *Id.* (citing *Woori Bank v. Merrill Lynch*, 923

15

F.Supp.2d 491, 494 (S.D.N.Y. 2013)).

16

Similarly, in the second case Defendant cites, *McMahan & Co. v. Donaldson, Lufkin &*

17

*Jenrette Securities Corp.*, the United States District Court for the Southern District of New York

18

considered whether a partnership that was incorporated in New York but had its principal place of

19

business in Connecticut was a resident of New York under the borrowing statute. 727 F. Supp.

20

833, 834 (S.D.N.Y. 1989). In concluding that the partnership was not a New York resident, the

21

court reasoned that corporations are domiciled where they are incorporated but reside where they

22

have their principal place of business. *Id.* (citing *Antone v. General Motors Corp.*, 473 N.E.2d

23

742 (N.Y. 1984)).

24

These cases are unpersuasive because the tests for accrual under the New York and

25

Nevada borrowing statutes are distinct. Under New York law, a cause of action accrues, for

26

purposes of the state's borrowing statute, "where the plaintiff resides and sustains the economic

27

impact of the loss." *EMC Mortg. LLC v. Pulte Mortg. LLC*, 441 F. Supp. 3d 1140, 1151 (D. Colo.

28

2020) (citing *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 482 (N.Y. 1999)). So, the New

1   York borrowing statute focuses on the *plaintiff's* residence because that is where the economic

2   injury is almost always felt. *See Epstein v. Haas Secs. Corp.*, 731 F.Supp. 1166, 1178 (S.D.N.Y.

3   1990) ("The economic injury is said to occur in a location other than where plaintiff resides only

4   in the extremely rare case where the party has offered unusual circumstances.") (internal

5   quotations omitted).

6       Conversely, under Nevada law, the cause of action accrues where the defendant resides.

7   *Lewis v. Hyams*, 63 P. 126, 128 (Nev. 1900). The Nevada test focuses on the *defendant's*

8   residence because that is where the court has personal jurisdiction over him. *Alberding v.*

9   *Brunzell*, 601 F.2d 474, 477 (9th Cir. 1979). Put simply, different purposes drive each state's

10  accrual test.

11      This difference in accrual tests may explain why courts applying New York's borrowing

12  statute choose a corporation's principal place of business rather than its place of incorporation to

13  determine residence. Businesses often pick their place of incorporation for the state's favorable

14  laws yet choose to conduct most of their business elsewhere. So, the place of economic injury is

15  more likely to be felt where a plaintiff corporation primarily does its business. Given the states'

16  different accrual tests, and the differing reasons behind those tests, this Court is not persuaded

17  that the Nevada Supreme Court would adopt the principal-place-of-business test merely because

18  courts applying New York's borrowing statute have done so.

19      The Court is also unpersuaded by Defendant's third-cited case, *Blank v. Ness*. No. JKB-

20  16-3735, 2018 WL 1399812 (D. Md. Mar. 20, 2018). Defendant cites *Blank* because the court

21  determined that the residence of "a limited liability company existing by virtue of the laws of the

22  State of Texas with its principal place of business located in Lafayette, Louisiana" was a

23  Louisiana resident. *Id.* at *3; ECF No. 25 at 7–8. But *Blank* does not stand for Defendant's

24  proposition.

25      First, *Blank's* context is distinguishable. In *Blank*, the United States District Court for the

26  District of Maryland considered, among other issues, whether it should dismiss the complaint for

27  improper venue under Federal Rule of Civil Procedure 12(b)(3). 2018 WL 139981, at *1–2. In

28  denying the defendants' motion to dismiss on this ground, the court reasoned that venue may

1   have been proper in Louisiana and Maryland under 28 U.S.C. § 1391(b). *Id.* at *3. The court

2   found that venue was proper in Maryland under § 1391(b)(2) because that is where a substantial

3   part of the events giving rise to the claim occurred. *Id.* The court further found that venue was

4   proper in Louisiana under § 1391(b)(1) because that was where all the defendants resided. *Id.*

5   　　　　Second, Defendant misconstrues the court's finding. Defendant suggests that the court

6   determined that Louisiana was a proper venue because that was where the defendant corporation

7   had its principal place of business as opposed to where it was incorporated. This is incorrect.

8   Under § 1391(b)(1), venue is proper in "a judicial district in which any defendant resides, if all

9   defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). The

10  court determined that the defendant corporation was incorporated in Texas with its principal place

11  of business in Louisiana, and it also found that the other defendants were residents of Louisiana.

12  2018 WL 139981, at *3. Therefore, the court determined that Louisiana was a proper venue under

13  § 1391(b)(1) because that was the only judicial district in which all the defendants resided, not

14  because that was where the defendant corporation had its principal place of business. *See id.*

15  　　　　In sum, Defendant does not make a compelling case that the Nevada Supreme Court

16  should adopt the principal-place-of-business test based on the above cases. Although the decision

17  is a challenging one because both the principal place of business and place of incorporation are

18  paradigm forums of personal jurisdiction for corporations, the Court believes that the Nevada

19  Supreme Court, when faced with this decision, would choose the place-of-incorporation test. The

20  simplicity of incorporation offers many advantages. Litigation may be reduced because parties

21  will no longer dispute where the defendant's principal place of business is, as here, under the

22  multi-factored test. In turn, courts may devote less resources to such arguments. Moreover,

23  corporations who choose to incorporate in Nevada will have more certainty regarding application

24  of Nevada's borrowing statute.

25  　　　　Having decided that the Nevada Supreme Court would look to the defendant corporation's

26  place of incorporation to determine its residence, the Court finds that Nevada's borrowing statute

27  does not bar Plaintiff's claim. Here, the cause of action arose in Nevada, where Defendant was

28  incorporated. Accordingly, the Court need not consider the parties' arguments regarding whether

1   Defendant had its principal place of business in Kansas. The Court therefore grants Plaintiff's

2   motion for partial-summary judgment.

**E. There is a genuine dispute of material fact as to whether the parties had an installment contract.**

3

4   **1. The parties' arguments.**

5   In its motion for summary judgment, Defendant argues that, should the Court find the

6   claim is within the statute of limitations, Plaintiff may only recover one payment (totaling

7   $7,500). ECF No. 25 at 9. According to exhibits that Plaintiff attached to his complaint, every

8   payment but one came due before April 28, 2017 (six years before Plaintiff filed his complaint).

9   ECF No. 1. Defendant argues that Nevada's six-year statute of limitations bars these payments

10  because they came due more than six years before Plaintiff filed his complaint. *Id.*

11  Plaintiff opposes on two grounds: (1) NRS § 11.200 dictates that actions accrue from the

12  date of the last item charged; and (2) Plaintiff's compensation was due upon producing testable

13  screws, not monthly. ECF No. 30 at 13. Defendant replies that NRS § 11.200 has no bearing here

14  and that the evidence shows Plaintiff was to be paid monthly. ECF No. 32 at 8–9. Additionally,

15  Defendant argues that Plaintiff cannot avoid summary judgment by creating a factual dispute with

16  himself. *Id.* (citing *Nelson v. City of Davis*, 571 F.3d 924 (9th Cir. 2009)). The parties do not

17  dispute the installment-contract issue in the briefings related to Plaintiff's motion for partial-

18  summary judgment.

19  Because Defendant is the moving party and argues that Plaintiff's recovery is partially

20  barred by the statute of limitations, it bears the burden of proof at trial. *See Fireman's Fund Ins.*

21  *Co. v. Sloan Valve Co.,* No. 2:10-CV-01816-MMD, 2013 WL 76264, at *1 (D. Nev. Jan. 3,

22  2013).  Accordingly, Defendant "must affirmatively demonstrate that no reasonable trier of fact

23  could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984

24  (9th Cir. 2007).

25  / /

26  / /

27  / /

28  / /

1        **2.  Plaintiff's position regarding the applicable law is unpersuasive.**

2        Defendant argues that NRS § 11.190 bars Plaintiff from recovering all but $7,500.[9] The

3    Nevada Supreme Court has affirmatively held that "where contract obligations are payable by

4    installments, the limitations statute begins to run only with respect to each installment when due."

5    *Clayton v. Gardner*, 813 P.2d 997, 999 (Nev. 1991). Plaintiff's cited authority, NRS § 11.200 and

6    *Taylor Bean & Whitaker Mortgage Corp. v. Vargas*, 408 P.3d 560, 2017 WL 6597161 (Nev.

7    2017), do not undermine this established rule. Plaintiff cites no cases in which a court has

8    construed NRS § 11.200 to allow plaintiffs to sweep otherwise time-barred claims under a non-

9    time-barred claim, nor could he. NRS 11.200 speaks only to computation of time for purposes of

10   commencing an action. And crucially, binding authority contradicts Plaintiff's argument. *See*

11   *Clayton v. Gardner*, 813 P.2d 997, 999 (Nev. 1991).

12       Moreover, the case Plaintiff cites, *Vargas*, fails to support his point. 408 P.3d 560, 2017

13   WL 6597161 (Nev. 2017). In *Vargas*, the Nevada Supreme Court considered when the statute of

14   limitations began to run on a breach-of-contract claim. *Id.* at *1. Appellants argued that the statute

15   of limitations began to run when the appellee became past due on her monthly payments. *Id.* The

16   appellee argued that the statute of limitations began to run when she made her last payment. *Id.*

17   The court agreed with the appellants. It reasoned that under NRS § 11.200, the last transaction in

18   the case took place when the appellee failed to make a timely monthly payment. *Id.* at *2.

19       Additionally, *Vargas* is factually distinguishable. The appellant filed his complaint within

20   six years of the appellee first failing to pay her monthly mortgage bill. Here, Plaintiff did not file

21   his complaint within six years of Defendant first failing to pay Plaintiff's alleged monthly salary.

22   In sum, Plaintiff has presented no caselaw that contradicts the established rule that the statute of

23   limitations begins to run when each installment becomes due. *See Clayton v. Gardner*, 813 P.2d

24   997, 999 (Nev. 1991).

25   / /

26   / /

27

28   ―――――――――――――
     [9]  As explained in Section II.B., this Court applies Nevada's statute of limitations.

### 3. Defendant has met its initial burden.

With the legal issue resolved, the Court now considers whether Defendant has met its initial burden. Defendant must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Here, Defendant points to the exhibits attached to Plaintiff's complaint, including the employment-verification letter. ECF No. 25 at 9 (citing ECF No. 1). As discussed previously, the letter states that Plaintiff's compensation was $2,500 per month from October 2012 through July 2013, $10,000 per month from August 2013 through September 2013, and $7,500 per month from October 2013 to the date of the letter (November 5, 2015). *Id.* The letter uses the term "monthly compensation." *Id.* Plaintiff relies on this letter to show that the parties' contract was based on an instrument in writing. ECF No. 30. Also attached to Plaintiff's complaint is a "DPT Payment History" chart that includes columns titled "date due" and "amount due." ECF No. 1, Ex. 3. This chart shows that Plaintiff's monthly salary was due each month, and the "balance due" increased each month he was not paid. *Id.*

As discussed above, "where contract obligations are payable by installments, the limitations statute begins to run only with respect to each installment when due." *Clayton v. Gardner*, 813 P.2d 997, 999 (Nev. 1991). Defendant argues that because the contract provided for monthly compensation, the obligation was payable by installments and the statute of limitations began to run when each installment was due. ECF No. 25 at 9. According to Plaintiff's payment-history chart, the last payment came due on May 1, 2017. ECF No. 1, Ex. 3-B. Plaintiff filed his complaint on April 28, 2023. ECF No. 1. The statute of limitations for contracts founded upon an instrument in writing is six years. NRS § 11.190. So, according to Plaintiff's own chart, the only payment that came due within the six-year statute of limitations was the last payment for $7,500. ECF No. 1, Ex. 3-B. Also according to Plaintiff's own expense report, the last expense came due on March 8, 2017, which is outside of the six-year statute of limitations. *Id.*

Defendant offers additional evidence, Plaintiff's interrogatory responses, in its reply. ECF No. 32. When asked to identify and describe all facts and circumstances reflecting the agreed-upon compensation, Plaintiff responded that his "compensation for working on the Spine Project

would be $10,000 per month" but that he "unilaterally reduced his compensation to $7,500 per month . . . The Employment Verification confirms in writing the terms of Plaintiff's employment with Defendant." ECF No. 25, Ex. 4-A at 4–5. The employment-verification letter says nothing about Plaintiff's compensation being premised on reaching certain milestones. ECF No. 31, Ex. 16. Plaintiff reiterated this information in later interrogatory responses as well. ECF No. 25, Ex. 4-A at 11–13. In sum, Defendant has presented evidence and binding law showing that all but one past-due payment for $7,500 is barred by NRS § 11.190.

### 4. Plaintiff has met its burden.

Because Defendant has met its initial burden, the burden now shifts to Plaintiff to show a genuine dispute of material fact. Plaintiff filed a declaration and 21 exhibits in support of his opposition. ECF No. 31.

In his declaration, Plaintiff states that his compensation was payable upon achieving certain milestones, rather than payable monthly. *Id.* at 13. Defendant argues that this contradicts Plaintiff's sworn discovery responses, in which he stated that he was to be paid monthly. ECF No. 32 at 9. Citing *Nelson v. City of Davis*, 571 F.3d 924 (9th Cir. 2009), Defendant argues that Plaintiff cannot avoid summary judgment by submitting a declaration that contradicts his submitted evidence and sworn discovery responses. *Id.*

In *Nelson v. City of Davis*, the Ninth Circuit stated that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." 571 F.3d at 927 (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991)). One of the purposes of this rule is to prevent "a party who has been examined at length on deposition from rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting *Kennedy*, 952 F.2d at 266) (internal quotation marks omitted). Here, Defendant argues that Plaintiff's declaration contradicts his sworn responses to interrogatories, not prior deposition testimony. ECF No. 32 at 9. Absent

1    further argument or legal authority from Defendant explaining why the Court should apply this

2    rule to sworn discovery responses, the Court will not do so.[10]

3           Returning to Plaintiff's burden, he must establish that a genuine issue of material fact

4    exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The

5    non-moving party does not need to establish the material fact in its favor. Rather, it is sufficient

6    that "the claimed factual dispute [would] require a jury or judge to resolve the parties' differing

7    version of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626,

8    631 (9th Cir. 1987). Still, the non-moving party "must produce specific evidence, through

9    affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps.,*

10   *Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). A "scintilla of evidence" or "some metaphysical

11   doubt" is not enough to meet the burden. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

12   (1986); *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002).

13          Material facts are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at

14   248–49. According to Plaintiff, the contract became payable upon certain milestones.

15   "Defendant's argument supposes that Plaintiff was to be paid monthly . . . in this case it has been

16   firmly established that Plaintiff['s] compensation was to be deferred until pedicle screws were

17   ready for testing." ECF No. 30 at 13. This dispute—that is, when Defendant's obligation became

18   payable—is material because it determines whether the majority of Plaintiff's claimed damages

19   are time barred. Additionally, Plaintiff has shown that this dispute is genuine, as seen in the below

20   evidence he submitted.

21         In his declaration, Plaintiff states that when he spoke to Mr. Orman, he "offered to work

22   on the feasibility study for $2,500 per month, which was acceptable to Mr. Orman." ECF No. 31

23   at 8, ¶ 37. But Plaintiff goes on to state: "It was never established or understood that I would be

24

25   [10]  Even if the Court were to apply the sham-affidavit rule here, it cannot say that Plaintiff's statements
     "flatly contradict[]" one another. *Kennedy*, 952 F.2d at 266. In both his declaration and discovery

26   responses, Plaintiff maintains that his compensation was $7,500 per month. *See* ECF No. 25, Ex. 4-A at 4–
     5; *see also* ECF No. 31 at 9, ¶¶ 43, 63–65. In his declaration, Plaintiff states that his compensation was

27   payable upon reaching certain milestones, rather than payable monthly. Plaintiff's discovery responses do
     not address when his compensation was payable. Even if his discovery responses imply that he was to be

28   paid monthly, such implication does not rise to the level of "flatly contradicts."

1    paid on a monthly basis while working on the spine project. Instead, my 'rate' was established as

2    $2,500 per month, while payment was to be timed in accordance with certain 'milestones' being

3    reached." *Id.* at 9, ¶ 43. Plaintiff says that the "'milestone' that Mr. Orman set for payment of

4    [his] future compensation was having prototype pedicle screws manufactured, assembled, and

5    ready for ASTM 1717 testing." *Id.* at 11, ¶ 53.

6           In support of Plaintiff's theory that his monthly compensation was "payable upon

7    achievement of a testable pedicle screw," Plaintiff refers to the following February 2017 email

8    exchange, in which Mr. Orman asked: "What is your estimate for personnel costs to complete this

9    stage of the project?" *Id.* at 12, ¶¶ 63–64, Ex. 11. Plaintiff replied: "I'm the only other personnel

10   expense, I'm working on a monthly basis as an at-will independent contractor, the expected time

11   frame for having everything submitted for our 510(k) is 60-90 days at $15,000-$22,500." *Id.*

12   Plaintiff attached another email from February 2017, in which he wrote to Mr. Orman:

13   "Considering that my compensation was perpetually being held up because we still had no

14   testable screws, I had a lot invested in getting this job done ASAP." *Id.* at 13, ¶ 64, Ex. 9.

15          Plaintiff further explains that the sporadic payments from Defendants were advances.

16   "Despite not having yet achieved the milestone of hav[ing] testable prototype screws, Mr. Orman

17   acceded to my requests for an advance on three occasions." *Id.* ¶ 55. In support of this

18   explanation, Plaintiff attached an email he sent to Aaron Deuser (Defendant's controller), in

19   which Plaintiff wrote: "Christian told me yesterday that [Mr. Orman's] going to send me an

20   advance on salary and expenses." *Id.*, Ex. 10.

21          Plaintiff has presented specific evidence showing that a genuine dispute exists. He

22   submitted a declaration explaining his view of when the contract was payable and attached emails

23   that support his theory. The Court is readily aware that it may not make credibility determinations

24   at this stage. *Dominguez–Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005).

25   Those determinations are for the factfinder at trial. *Id.* And here, the parties' differing views of

26   when the contract became payable requires a factfinder to resolve. *See T.W. Elec. Serv., Inc. v.*

27   *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). Because Plaintiff has met his

28

1  burden to show that a genuine dispute of material fact exists, the Court denies Defendant's

2  motion for summary judgment.

3  **III.    CONCLUSION**

4      **IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (ECF

5  No. 25) is DENIED.

6      **IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment

7  (ECF No. 33) is GRANTED.

8

9      DATED: March 11, 2025

10

11  _____

12  BRENDA WEKSLER
    UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28