# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

DANIEL P. TABER,

     Plaintiff

v.

EXEMPLAR HOLDINGS, LLC,

     Defendant

Case No.: 2:23-cv-00670-APG-BNW

**Order (1) Denying Defendant's Motion for Leave to File a Reply to its Objection to Magistrate Judge Weksler's Recommendations and (2) Granting in Part Defendant's Objection to Magistrate Judge Weksler's Recommendations**

[ECF No. 25, 33, 39, 44]

     Daniel Taber worked for Exemplar Holdings, LLC for over four years on a project to develop screws to be used in spine surgical procedures. Taber's employment with Exemplar Holdings ended in April 2017, and he brought this action for breach of contract seeking to recover alleged unpaid compensation covering three and a half years of work. Exemplar Holdings moved for summary judgment while Taber moved for partial summary judgment. Magistrate Judge Weksler entered an order denying Exemplar Holdings summary judgment and granting Taber partial summary judgment. Exemplar Holdings objected to the order, and I now treat Judge Weksler's order as recommendations under Local Rule IB 1-4.[1] Exemplar Holdings also seeks leave to file a reply to its objection to Magistrate Judge Weksler's recommendations.

     I deny Exemplar Holdings leave to file a reply. I partially grant Exemplar Holdings' objection to Magistrate Judge Weksler's recommendations. In a separate order, I will certify a question to the Supreme Court of Nevada.

////

---

[1] From this point, I refer to Magistrate Judge Weksler's order on both parties' motions for summary judgment, ECF No. 38, as "Magistrate Judge Weksler's recommendations."

## I.    BACKGROUND

Taber is a citizen of California and was so at all times during the events relevant to his claim. ECF No. 1 at 1.  Exemplar Holdings is a limited liability company (LLC) formed in Nevada. ECF No. 19 at 1.

In October 2012, Exemplar Holdings' sole member and manager, Gregory Orman, contacted Taber to hire him to assess the feasibly of creating a generic pedicle screw. ECF Nos. 25-2 at 2-3; 31 at 7.  A pedicle screw is used in spinal fixation medical procedures. ECF No. 31 at 7.  Taber's work on pedicle screws for Orman would come to be known as the "Screw Project."  The Screw Project's goal was to develop and manufacture a low-cost pedicle screw that the Food and Drug Administration (FDA) cleared for sale in the United States. ECF No. 25-2 at 3.  Taber would be working jointly on the Screw Project with Exemplar Holdings employee Christian Moore.[2] ECF Nos. 31 at 8, 77; 25-3 at 2.

Taber first agreed with Orman to work for Exemplar Holdings as an independent contractor on a feasibility study to create such screws at a rate of $2,500 a month starting in October 2012. ECF No. 31 at 8.  Exemplar Holdings paid $7,500 to Taber in early 2013 for his work from October to December 2012. *Id.* at 9.

Taber continued his work on the feasibility study until he met with Orman and Moore at the office of Exemplar Wealth Management, LLC, another of Orman's entities, on July 29, 2013. ECF No. 31 at 10, 89.[3]  At the meeting, Orman decided he would produce prototype pedicle screws and asked Taber and Moore to prepare a budget for the project. *Id.* at 10.  Under this new

---

[2] Moore states that he was a consultant for Exemplar. ECF No. 25-3 at 2.  His LinkedIn page states he was the Managing Director at Exemplar Holdings, LLC from April 2011 to the date the webpage was recorded, August 15, 2023. ECF No. 31 at 77.

[3] The parties dispute whether this also served as the office for defendant Exemplar Holdings.

budget, Taber's compensation rate increased to $10,000 a month. *Id.* Orman approved the budget. *Id.* According to Taber, Orman signed the budget document at the July 2013 meeting and took the signed document with him. ECF Nos. 25-6 at 5; 31 at 10. Orman and Moore both assert that Exemplar Holdings did not enter into a written contract with Taber at this meeting. ECF Nos. 25-2 at 3; 25-3 at 3. No party has produced a written, signed budget from the July 2013 meeting. The unsigned budget Taber provided lists Exemplar Holdings, LLC as the corporate entity the project fell under. ECF No. 31 at 46. A few months later, in November 2013, Taber orally agreed with Moore to reduce his monthly rate to $7,500 and made it retroactive to October 2013. ECF Nos. 25-6 at 13-14; 31 at 17, 73.

Taber maintains that his compensation was due only upon producing prototype pedicle screws that were ready for ASTM 1717 testing. ECF No. 31 at 11. ASTM 1717 testing would determine if the screws were substantially equivalent to screws already approved for sale, and if their screws passed the testing then the FDA would likely approve them for sale as well. *Id.* Exemplar Holdings, however, disagrees that Taber was due payment only upon producing testable screws and instead purports he was due payment every month he worked on the Screw Project. ECF No. 25 at 9-10 (citing payment history exhibits attached to Taber's complaint at ECF No. 1 at 10-11 that list monthly amounts due).

After the July 2013 meeting, Exemplar Holdings paid Taber several times at inconsistent intervals. An invoice Taber prepared and sent to Exemplar Holdings in 2017 notes that Taber was paid six times between July 2013 and May 2017 for a total of $105,000. ECF No. 1 at 10-11. In his declaration, Taber states that he was paid only three times for a total of $60,000. ECF No. 31 at 11. In an email from Taber to an employee of Exemplar Wealth Management, LLC, Taber, quoting or paraphrasing Orman, describes one of these payments as an "advance on salary and

expenses." *Id.* at 54.  Taber asserts that all of these payments were advances. *Id.* at 11.  All payments were paid through Exemplar Holdings' bank account. ECF No. 33-1 at 16.

In November 2015, Taber needed documentation of his employment and compensation to apply for a home mortgage. ECF Nos. 25-7 at 3; 31 at 66.  Taber drafted a document describing his employment and compensation and sent it to Moore to sign. ECF No. 31 at 66*.*  Moore made minimal edits to the draft.  Moore put the document on Exemplar Medical, LLC letterhead, included a Kansas address, added Exemplar Holdings, LLC as an entity Taber was working for, capitalized Taber's title of "Director," and signed it "For Exemplar." *Compare* ECF No. 31 at 67 *with id.* at 73.  He otherwise did not edit the substance of the document. *Compare id.* at 67 *with id.* at 73.  The parties refer to this document as the "Employment Verification."

The Employment Verification states that Taber "has been working as an independent contractor on behalf of Exemplar Wealth Management, LLC, Exemplar Holdings, LLC, and/or Exemplar Medical, LLC (limited liability companies organized pursuant to the laws of the State of Kansas, hereinafter referred to as 'Exemplar')." *Id.* at 73.  It states that Taber has been working part-time since October 2012 and full-time since July 2013. *Id.*  It lists his "official title" as "Director of Exemplar Medical, LLC," and states that "[h]is work responsibilities include all daily operations associated with Exemplar's spinal implant project." *Id.*  It states that his salary was $2,500 per month from October 2012 through July 2013, $10,000 per month from August 2013 through September 2013, and $7,500 per month starting in October 2013. *Id.*  It notes he is "reimbursed for certain pre-approved expenses directly related to the spinal implant project." *Id.* (emphasis omitted).

In a February 10, 2017 email to Orman, Taber estimated it would take "somewhere in the range of 80-100 hours" to "complete … pedicle screws ready for 1717 testing." *Id.* at 56.  A few

weeks later, Orman emailed Taber on April 29, 2017, stating he was "willing" to make four payments to Taber totaling $30,000 for the completion of the Screw Project. ECF No. 1 at 9. Taber alleges that by this point he was owed nearly $250,000 for his work dating back to 2013. *Id.* at 11.   Taber emailed Moore a month later stating that he interpreted Orman's April 29 email "seeking to re-negotiate [his] past compensation" as "effectively terminat[ing] [his] at-will employment." ECF No. 31 at 59.   He further stated that his "monthly salary has stopped effective the end of April 2017." *Id.*   He attached to that email an invoice with his payment history and an expense report. *Id.* at 60.   The invoice stated that Exemplar Holdings owed Taber $255,000 for his labor on the Screw Project from November 2013 through April 2017. ECF No. 1 at 10-11.   In another email to Moore a month later, Taber reiterated that he ended his work on the Screw Project on April 30, 2017. ECF No. 31 at 61.

Taber filed this suit on April 28, 2023. ECF No. 1 at 1.   Exemplar Holdings moved for summary judgment and Taber moved for partial summary judgment. ECF Nos. 25; 33. Magistrate Judge Weksler, who had been ruling on motions in this case, including Exemplar Holdings' motion to dismiss, granted Taber partial summary judgment and denied Exemplar Holdings summary judgment. ECF No. 38.   Exemplar Holdings objected to Magistrate Judge Weksler's order. ECF No. 39.   At that point, this case was assigned to me. ECF No. 40.   After finding that Exemplar Holdings did not consent to having a Magistrate Judge rule on dispositive motions in this case, I decided that I would treat Magistrate Judge Weksler's order on summary judgment as recommendations under Local Rule 1B 1-4. ECF No. 42.

## II.    MOTION FOR LEAVE TO FILE A REPLY

Exemplar Holdings seeks leave to file a reply in support of its objection to address what it believes are three "new admissions" Taber made in his opposition to Exemplar Holdings'

objection. ECF No. 44 at 1.  A reply to an objection "will be allowed only with leave of court."
LR IB 3-2(a).  I may refuse leave to file a reply when the party had prior opportunities to brief
the issues raised in the proffered reply. *See Collins v. Collins*, No. 3:16-cv-00111-MMD-WGC,
2019 WL 3573666, at *3 (D. Nev. Aug. 6, 2019).  Because Taber made every admission that
Exemplar Holdings seeks to respond to in earlier filings before Magistrate Judge Weksler issued
her recommendations, I deny Exemplar Holdings' motion to file a reply.

First, Exemplar Holdings seeks to respond to Taber's concession that he was an at-will
employee on the Screw Project.  But it was on notice that Taber considered himself such long
before he filed his opposition to Exemplar Holdings' objection.  In his declaration in opposition
to Exemplar Holdings' motion for summary judgment, Taber included as exhibits two emails he
sent to Orman in 2017 where he describes his employment status as an "at-will independent
contractor" and "at-will employment." ECF No. 31 at 56, 59.  Taber included both of these
quotes in the body of his declaration. *Id.* at 12, 13.  Magistrate Judge Weksler also included these
quotes in her recommendations. ECF No. 38 at 3, 22.  Additionally, these emails were sent to
Exemplar Holdings' sole member and manager, so it had access to them at the outset of
litigation.  Exemplar Holdings has not explained why it could not have responded to Taber's
admission of at-will employment in its objection to Magistrate Judge Weksler's
recommendations.

Exemplar Holdings next wishes to reply to Taber's assertion that he was entitled to
payment only upon reaching the milestone of producing testable screws.  It intends to argue that
the term cannot be a part of their agreement because the Employment Verification, which is the
document Taber argues is the written basis of their agreement, does not reference milestone-
based payments.  But Exemplar Holdings has not explained why it could not have raised this

argument earlier.  Across Taber's complaint, his opposition to Exemplar Holdings' summary judgment motion, and his declaration in opposition to Exemplar Holdings' summary judgment motion, he stated multiple times that he understood his payment to be based upon the milestone of producing testable screws. ECF Nos. 1 at 5; 30 at 2; 31 at 9, 11-13, 17.  He also attached the Employment Verification to his complaint and argued in his opposition to Exemplar's summary judgment motion that the Employment Verification was the written instrument on which his agreement with Exemplar Holdings was based. ECF Nos. 1 at 8; 30 at 12-13.  Exemplar Holdings argued in its objection that finding that the Employment Verification is an instrument in writing under Nevada Revised Statute (NRS) § 11.190(1)(b) but not an installment contract is internally inconsistent because the Employment Verification did not contain the material term that Taber's compensation is due upon producing testable screws. ECF No. 39 at 11 n.6. Therefore, Exemplar Holdings was aware it could make the argument when filing its objection, and a reply is not necessary to supplement the points it already made in its objection.

Finally, Exemplar Holdings seeks to reply to Taber's admission that he did not produce testable screws and argue that he is not entitled to payment from Exemplar Holdings because he failed to perform under his alleged terms of the agreement.  Taber's opposition to Exemplar Holdings' objection may have been the first time he explicitly said that "no testable pedicle screws were ever assembled and made ready for testing." ECF No. 43 at 4.  But in his declaration in opposition to Exemplar Holdings' summary judgment motion, Taber argued that he was entitled to compensation because Exemplar Holdings "had effectively repudiated the basis upon which [Taber] was promised to be paid (upon passing '1717 testing' [of the screws])." ECF No. 30 at 14 (citing *Finnell v. Bromberg,* 381 P.2d 221 (Nev. 1963) (describing how a plaintiff may be able to recover from a defendant due to the defendant's anticipatory

1  breach)).  By raising anticipatory breach as a ground for recovery from Exemplar Holdings,

2  Taber implicitly admitted that he did not perform to his alleged terms of the agreement by

3  producing testable screws.  At no point has Taber alleged or stated that he is entitled to

4  compensation from Exemplar Holdings because he met the milestone of producing testable

5  screws.  Indeed, as the overseer of the screw project, Exemplar Holdings would have known at

6  the outset of litigation that no testable screws were ever produced.  Exemplar Holdings has not

7  provided a justifiable reason why it waited until this late stage of briefing on summary judgment

8  to raise the argument that Taber cannot recover because he did not perform to his alleged terms

9  of the agreement by not producing testable screws.  Therefore, I deny Exemplar Holdings'

10  motion for leave to file a reply in support of its objection to Magistrate Judge Weksler's

11  recommendations.

12  **III.    THE PARTIES' SUMMARY JUDGMENT MOTIONS**

13      At summary judgment, the parties disputed what statute of limitations applies.[4]

14  Exemplar Holdings moved for summary judgment on three grounds: (1) there is no instrument in

15  writing between the parties, so Nevada's four-year statute of limitations applies to Taber's

16  breach of contract claim; (2) Nevada's borrowing statute, which imports the statute of limitations

17  from another state, bars Taber's claim by importing Kansas' or California's statute of limitations;

18  and (3) even if there is a written agreement such that Nevada's six-year statute of limitations

19  applies, this is an installment contract, so Nevada's statute of limitations bars any payments due

20

---

21  [4] The parties do not address choice of law in their briefs.  Magistrate Judge Weksler briefly
   analyzed the issue.  She found that a U.S. District Court in Nevada applies Nevada's choice of

22  law rules. ECF No. 38 at 6 (citing *First Intercontinental Bank v. Ahn,* 798 F.3d 1149, 1153 (9th
   Cir. 2015)).  Nevada applies its own statutes of limitations in contracts cases in its courts. *Sierra*

23  *Diesel Injection Serv. v. Burroughs Corp., Inc.*, 648 F. Supp. 1148, 1152 (D. Nev. 1986); *Wilcox
   v. Williams,* 5 Nev. 206, 212 (1869).  Neither party challenges her conclusion.  I see no reason to
   decide otherwise, so I rule the same.

1  more than six years prior to Taber filing his complaint.  Exemplar Holdings also argued that even

2  if Nevada's six-year statute of limitations applies, it should run from the date testable screws

3  were allegedly produced, which it proposes was in February 2017.  Taber moved for partial

4  summary judgment that the Nevada six-year statute of limitations applies because Nevada's

5  borrowing statute does not apply in this case.

6        For dispositive matters, such as summary judgment motions, I review de novo a

7  magistrate judge's report and recommendations. *Bastidas v. Chappell,* 791 F.3d 1155, 1159 (9th

8  Cir. 2015).  Summary judgment is appropriate if the movant shows "there is no genuine dispute

9  as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

10  56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

11  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence

12  is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

13        The party seeking summary judgment bears the initial burden of informing the court of

14  the basis for its motion and identifying those portions of the record that demonstrate the absence

15  of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

16  burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

17  genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

18  Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

19  genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

20  reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of*

21  *Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).

22  / / / /

23  / / / /

**A.  A reasonable jury could find that Taber's and Exemplar Holdings' agreement is founded upon an instrument in writing.**

Taber filed his complaint on April 28, 2023, almost six years from when Taber argues Exemplar Holdings ended his employment on April 29, 2017.  Exemplar Holdings argues that Taber's action is barred by Nevada's four-year statute of limitations for an "action upon a contract, obligation or liability not founded upon an instrument in writing." Nev. Rev. Stat. (NRS) § 11.190(2)(c).  Taber responds that Nevada's six-year statute of limitations applies because his claim is an "action upon a contract, obligation or liability founded upon an instrument in writing." NRS § 11.190(1)(b).  The parties dispute whether the Employment Verification, the letter which stated Taber's job title and salary that he used to secure a mortgage, is an "instrument in writing" under NRS § 11.190(1)(b) such that the six-year statute of limitations applies to Taber's claim.

Taber did not affirmatively move for summary judgment that the Employment Verification is an instrument in writing under NRS § 11.190(1)(b).  His motion stated that its "purpose . . . is to resolve with finality the statute of limitations issue, i.e., whether Nevada's borrowing statute applies in this case" and asks that I rule that Nevada's six-year statute applies. ECF No. 33 at 2, 5.  For Nevada's six-year statute to apply, two things must be true: (1) there is an instrument in writing that the parties' agreement is founded upon and (2) Nevada's borrowing statute does not apply to Taber's claim.  But Taber's motion argued only that Nevada's borrowing statute does not apply.  His motion assumed there is an instrument in writing without affirmatively making an argument that no reasonable jury could find otherwise.  His reply in support of his motion for partial summary judgment argues that the Employment Verification is

1  an instrument in writing, but I "need not consider arguments raised for the first time in a reply

2  brief." *Zamani v. Carnes,* 491 F.3d 990, 997 (9th Cir. 2007).

3      Taber argued in his response to Exemplar Holdings' motion for summary judgment that

4  the Employment Verification "suffices" as an instrument in writing, but he had a different

5  burden in that procedural posture. ECF No. 30 at 13.  All a non-moving party needs to show to

6  defeat a summary judgment motion is that a reasonable jury could rule for him; meanwhile, a

7  moving party's burden for summary judgment is to show that no reasonable jury could rule

8  against him. *Anderson*, 477 U.S. at 248.  Consequently, Taber's statement in his response and his

9  argument in his reply are insufficient to move for summary judgment that the Employment

10  Verification is an instrument in writing under NRS § 11.190(1)(b).  Therefore, I analyze whether

11  the Employment Verification is a written instrument only in the context of Exemplar Holdings'

12  summary judgment motion, which argues it is not an instrument in writing under NRS

13  § 11.190(1)(b).  In doing so, I view all facts in the light most favorable to Taber as the

14  nonmoving party.

15      "[A]ll that is required" for an agreement to be founded upon an instrument in writing "is

16  that there be a writing which fairly imports the obligation to pay." *El Ranco, Inc. v. N.Y. Meat &*

17  *Provision Co.*, 493 P.2d 1318, 1321-22 (Nev. 1972).  "[S]trict construction should not be applied

18  by the courts in determining what does and what does not constitute a contract in writing" under

19  the statute of limitations. *Id.* at 1321 (quotation omitted).  For example, the Supreme Court of

20  Nevada found that a receipt containing a list of the goods ordered, the prices of the goods, the

21  name of the buyer, and the signature of the party the contract was to be enforced against was an

22  instrument in writing under NRS § 11.190(1)(b). *Id.* at 1319, 1321.

23

1    Viewing the evidence in the light most favorable to Taber, the Employment Verification

2   fairly imports Exemplar's obligation to pay Taber for his labor on the Screw Project.  It states

3   that Taber "has been working as an independent contractor on behalf of … Exemplar Holdings,

4   LLC" where "[h]is work responsibilities include all daily operations associated with Exemplar's

5   spinal implant project." ECF No. 31 at 70.  It describes his compensation as:

6           $2,500 per month from October 2012 through July 2013. From August 2013
            through September 2013 his compensation was $10,000 per month.  From October
7           2013 and continuing to date [of the letter, November 5, 2015], Mr. Taber's agreed-
            upon compensation has been $7,500 a month. In addition to his monthly
8           compensation as an independent contractor, Mr. Taber is also reimbursed for
            certain pre-approved expenses directly related to the spinal implant project.
9

10   Id. (emphasis omitted).  By tying Taber's compensation specifically to his work for Exemplar,

11   the Employment Verification fairly imports Exemplar Holdings' obligation to pay Taber for his

12   labor.

13    Although Taber drafted the Employment Verification, when viewing the facts in the light

14   most favorable to him, Exemplar Holdings' agent signed it. Id.  Moore signed the Employment

15   Verification "For Exemplar." Id.  Earlier, the Employment Verification stated that its use of

16   "Exemplar" refers to all three of Exemplar Holdings, LLC, Exemplar Wealth Management, LLC,

17   and Exemplar Medical, LLC. Id.  Thus, a reasonable jury could find Moore signed on behalf of

18   all three entities.  Additionally, a reasonable jury could find that Moore was Exemplar Holdings'

19   agent when he signed the Employment Verification in November 2015.  Although Moore states

20   in his declaration that he was only a consultant, his LinkedIn page on August 15, 2023 states he

21   had been the Managing Director at Exemplar Holdings since April 2011. ECF Nos. 25-3 at 2; 31

22   at 77.  A signature from the agent of the party the agreement is to be enforced against is evidence

23   that the document is an instrument in writing under NRS § 11.190(1)(b). See El Ranco, 493 P.2d

at 1322 ("In the absence of signed documentation, our ruling [that the signed receipt was an instrument in writing] may be different."); *cf Matter of Estate of Schwartz,* Nos. 78341, 79464, 507 P.3d 182, 2022 WL 970215, at *1 (Nev. 2022) (unpublished) (finding there was no instrument in writing where the document in question was unsigned by the party the agreement was to be enforced against).

Exemplar Holdings argues that as a matter of law an employment verification letter cannot be a written employment agreement, citing *Twomey v. Quad/Graphics, Inc.*, No. 13-cv-1109 (RA), 2015 WL 5698002 (S.D.N.Y. Sept. 28, 2015). I disagree. First, *Twomey* does not stand for the proposition that all employment verification letters cannot be written contracts as a matter of law, just that the letter in that case was not an enforceable contract. *Id.* at *14. Second, *Twomey* analyzed whether the employment verification letter in question was an enforceable contract under New York law. *Id*. at *11. Even assuming that Nevada law interprets contracts the same way that New York law does, deciding whether a document is an enforceable contract under Nevada law is different than determining if a document is an instrument in writing under NRS § 11.190(1)(b). Under Nevada law, an enforceable contract requires "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson,* 119 P.3d 1254, 1257 (Nev. 2005). But an instrument in writing under NRS § 11.190(1)(b) need only "fairly import[] the obligation to pay." *El Ranco,* 493 P.2d at 1322. Indeed, the Supreme Court of Nevada specifically warned against "strict construction" of what qualifies as a "contract in writing" when interpreting Nevada's limitations statute. *Id.* at 1321 (quotation omitted). Therefore, whether a document is an enforceable contract is a different question from whether a document is an instrument in writing for limitations purposes under NRS § 11.190(1)(b). Finally, the letter in *Twomey* specifically instructed the reader to "not construe this offer as an employment contract,"

1   while the Employment Verification here contains no disclaimer. 2015 WL 5698002, at *1.

2   Therefore, *Twomey's* holding is not dispositive in this case.

3           Exemplar Holdings further argues that the six-year statute of limitations does not apply

4   because Taber admits his agreement with Exemplar Holdings was oral.  In Taber's declaration in

5   opposition to Exemplar Holdings' summary judgment motion, he stated that his "agreement to

6   reduce [his] monthly rate to $7,500 [was] an oral agreement." ECF No. 31 at 17.  However, in

7   the same paragraph, Taber also asserted that the Employment Verification was "an instrument

8   acknowledging the terms of [his] employment." *Id.*  He thus did not concede that there was no

9   instrument in writing between him and Exemplar Holdings.  More importantly, their oral

10  agreement does not preclude a later-written document from properly recording the agreement

11  under NRS § 11.190(1)(b).  For example, in *El Ranco*, the parties' initial agreement was oral,

12  when the defendant called the plaintiff on the telephone to order meat. 493 P.2d at 1319.  When

13  the plaintiff later delivered the meat to the defendant, the plaintiff brought multiple copies of the

14  receipt listing the purchaser, the goods, and the prices so the defendant's agent could sign them.

15  *Id.*  The Supreme Court of Nevada deemed these signed receipts "instruments in writing" under

16  NRS § 11.190(1)(b) even though the parties' initial agreement was made orally. *Id.* at 1321.

17  Similarly, viewing the facts in the light most favorable to Taber, the oral agreement here was

18  made before Taber and Exemplar Holdings entered into the written Employment Verification.  A

19  reasonable jury could find that they orally agreed to reduce Taber's monthly rate in November

20  2013. ECF Nos. 25-6 at 13-14; 31 at 17, 70.  The Employment Verification was signed about

21  two years later, on November 5, 2015. ECF No. 31 at 73.  Therefore, the fact that Taber's

22  compensation was initially established in an oral agreement does not preclude the later

23  Employment Verification from being an instrument in writing under NRS § 11.190(1)(b).

14

1    Exemplar Holdings next argues that even if the Employment Verification is an instrument

2    in writing under NRS § 11.190(1)(b), it does establish an agreement between itself and Taber.

3    Rather, Exemplar Holdings argues that it creates an employment relationship between Taber and

4    non-party Exemplar Medical, LLC.  The Employment Verification is printed on Exemplar

5    Medical letterhead and states that Taber's "official title is Director of Exemplar Medical, LLC."

6    ECF No. 1 at 8.  But it also states that Taber "has been working as an independent contractor on

7    behalf of Exemplar Wealth Management, LLC, Exemplar Holdings, LLC, and/or Exemplar

8    Medical, LLC (limited liability companies … hereinafter referred to as 'Exemplar')." *Id.*  And

9    Christian Moore signs the Employment Verification "For Exemplar." *Id.*  A reasonable jury

10   could find that the letter verifies Taber's employment for Exemplar Holdings, not just Exemplar

11   Medical, and that Moore signed for all three Exemplar entities.

12   Therefore, Exemplar Holdings fails to meet its burden to show that no reasonable jury

13   could find that the Employment Verification is an instrument in writing between Taber and

14   Exemplar under NRS § 11.190(1)(b).  As a result, I deny its objection to Magistrate Judge

15   Weksler's recommendations on that issue.

16   **B. Nevada's six-year statute of limitations would not run from when testable screws**

17   **were produced because no evidence shows screws were ever made.**

18   Exemplar Holdings argues that even if Nevada's six-year limitation period applies and if

19   Taber was due compensation upon producing testable screws as Taber contends,[5] then this action

20   is time-barred because testable screws were ready for testing on February 10, 2017 and Taber

21   filed his complaint more than six years later on April 28, 2023.  As proof of the date when

22

23

---

[5] Exemplar disputes that Taber was due payment upon producing testable screws and instead
argues that his compensation was an installment contract.

testable screws were produced, Exemplar Holdings points to Magistrate Judge Weksler's findings in her recommendations that "the pedicle screws were ready for testing sometime before February 10, 2017." ECF No. 38 at 3.  Magistrate Judge Weksler cites to an email from Taber to Orman as proof the screws were ready for testing prior to February 10, 2017. *Id.*  But genuine disputes remain regarding whether that email states that testable screws had been produced.  In the email, Taber stated that it would take "somewhere in the range of 80-100 hours" to "complete … pedicle screws ready for 1717 testing." ECF No. 31 at 56.  A reasonable jury thus could find that Taber still had not finished production of testable screws as of February 10, 2017.

Additionally, there is no other conclusive evidence that Taber produced any testable screws.  Taber has not alleged nor provided any evidence of testable screws even though he argues he was entitled to payment upon producing them.  Exemplar Holdings also has not produced any evidence testable screws were made.  Because Exemplar Holdings has not pointed to evidence showing there is no dispute that testable screws were produced, I cannot rule as a matter of law that Nevada's six-year limitation period runs from the date of the production of testable screws.  I therefore deny Exemplar's objection on this ground.

### C.  I will certify to the Supreme Court of Nevada the question of where a cause of action on an obligation against an LLC arises under the Nevada borrowing statute.

Exemplar Holdings moves for judgment that Nevada's borrowing statute precludes Taber's claim by applying the statute of limitations from either Kansas or California, both of which expired before Taber filed suit.  Taber moves for judgment that Nevada's borrowing statute does not apply and thus Nevada's six-year statute of limitations does instead.

Nevada's borrowing statute states that:

> When a cause of action has arisen in another state, . . . and by the laws thereof an action thereon cannot there be maintained against a person by reason of the lapse of time, an action thereon shall not be maintained against the person in this State, except in favor of a citizen thereof who has held the cause of action from the time it accrued.

NRS § 11.020.  Essentially, this means I apply another jurisdiction's statute of limitations if: (1) the cause of action arose in another jurisdiction; (2) the cause of action would be barred by that other jurisdiction's statute of limitations; and (3) the plaintiff was not a Nevada citizen at the time of filing the complaint. *See Flowers v. Carville*, 310 F.3d 1118, 1125 (9th Cir. 2002) ("[Plaintiff] held her cause of action from the time it accrued, and she was a citizen of Nevada when she filed her complaint.  The exemption to Nevada's borrowing statute requires no more.").

Taber concedes that he is and was at all relevant times a California citizen. ECF No. 1 at 1.  Both Kansas' and California's statutes of limitations will bar Taber's claim if they apply. Kansas' limitations periods are five years for actions upon agreements in writing and three years for actions upon agreements not in writing. Kan. Stat. Ann. §§ 60-511(1), 60-512(1). California's limitations periods are four years for actions upon an agreement founded upon an instrument in writing and two years for an action upon an agreement not founded upon an instrument in writing. Cal. Civ. Proc. Code §§ 337(a), 339.  Therefore, the only question to determine whether Nevada's borrowing statute applies is where Taber's cause of action arose.

> 1. *Under the borrowing statute, a breach of contract claim arises where the defendant resides when the obligation became due, but Nevada law is unclear about where an LLC resides under the Nevada borrowing statute.*

Under Nevada's borrowing statute, a cause of action on a contractual obligation arises where the defendant resided when the obligation came due. *Lewis v. Hyams,* 63 P. 126, 127

1  (Nev. 1900) ("[W]hen default was made in the payment of said note, the cause of action thereon

2  against the appellant arose or accrued in the state of New York; that in such case as this the cause

3  of action accrues in any state against the defendant where he may be found."); *Alberding v.*

4  *Brunzell*, 601 F.2d 474, 477 (9th Cir. 1979).  The Supreme Court of Nevada justified this ruling

5  because the defendant's residence is where a local court could have "acquired jurisdiction of [the

6  defendant]," where the plaintiff's claim against the defendant "could have been enforced," where

7  the plaintiff "had the right to institute and carry through an action against" the defendant, and

8  where the plaintiff "could have prosecuted the action against the [defendant] with effect." *Lewis,*

9  63 P. at 127.  The Supreme Court of Nevada later reaffirmed *Lewis'* holding and found that it

10 "was based upon the question as to whether jurisdiction could be obtained over the defendant."

11 *Wing v. Wiltsee*, 223 P. 334, 336 (Nev. 1924).  No more recent Supreme Court of Nevada case

12 addresses this question.

13        Fifty years later, the Ninth Circuit rejected the opportunity to find that the Supreme Court

14 of Nevada would overturn *Lewis* and *Wing* because of recent developments to personal

15 jurisdiction doctrine. *Alberding*, 601 F.2d at 477-78.  It reaffirmed that, under the Nevada

16 borrowing statute, "the cause of action on an obligation accrues in the place where the defendant

17 resides when the obligation came due." *Id.* at 477.  "The reasoning behind the rule was that a

18 cause of action arises in the place where the defendant can be sued, and at the time [*Lewis* and

19 *Wing*] were decided, personal jurisdiction could only be obtained in the state of residence." *Id.*

20        The question in this case is thus where Exemplar Holdings resided when its obligation to

21 Taber became due.  The answer is not immediately obvious.  Taber argues Exemplar Holdings

22 resides at its place of formation, Nevada.  Exemplar Holdings argues it resides at its principal

23 place of business, which it claims is Kansas.  Though Exemplar Holdings makes a passing

argument that California could also be where Taber's claim arose, because that is where Taber

worked on the Screw Project, it admits it never had a legal residence or place of business in

California. ECF No. 33-1 at 23. Because Exemplar Holdings did not reside in California,

Nevada and Kansas are the only remaining options for where Taber's cause of action arose.

The answer is further complicated by the fact that Exemplar Holding is a limited liability

company (LLC). Where an LLC resides under the Nevada borrowing statute is unsettled under

Nevada law. *Lewis*, *Wing*, and *Alberding* all dealt with defendants who were natural persons, not

corporate entities. No other Supreme Court of Nevada case addresses the issue where an entity

resides under the Nevada borrowing statute. In absence of controlling state law, I must use my

best judgment to predict how the state's highest court would decide the issue. *Takahashi v.

Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980). I may look to intermediate

appellate court decisions, statutes, and well-reasoned decisions from other jurisdictions for

guidance. *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

The reasoning in *Lewis* and *Wing* narrows down the location where an LLC resides to

two places: its place of formation and its principal place of business. The Supreme Court of

Nevada decided that a cause of action arises where the defendant resides because that is where a

court has jurisdiction over the defendant. *Lewis*, 63 P. at 127; *Wing*, 223 P. at 336. The

paradigmatic bases for general jurisdiction over an LLC are place of formation and principal

place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *Impossible Foods Inc. v.

Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023).

While Nevada is clearly Exemplar Holdings' place of formation, the parties dispute

where Exemplar Holdings' principal place of business was. Taber argues that Exemplar

Holdings did not have its principal place of business in Kansas because it never did business

1  there.  But there is no genuine issue of material fact that Exemplar Holdings' principal place of

2  business was in Kansas, and Exemplar Holdings is entitled to judgment as a matter of law on that

3  point.

4         Principal place of business forms one of the paradigmatic bases for general jurisdiction

5  because it establishes "affiliations" with a jurisdiction that are "so continuous and systematic as

6  to render [the entity] essentially at home" in the jurisdiction. *Goodyear Dunlop Tires Operations,*

7  *S.A. v. Brown*, 564 U.S. 915, 919, 924 (2011) (simplified); *Daimler AG,* 571 U.S. at 137.

8  Exemplar Holdings' affiliations with Kansas were sufficiently "continuous and systematic" such

9  that Kansas was its principal place of business at the relevant time. *Goodyear Dunlop Tires*

10 *Operations, S.A.*, 564 U.S. at 919.  Its sole member and manager worked out of an office in

11 Kansas. *See* ECF Nos. 25-2 at 1; 31 at 10.  All of its management and administration tasks were

12 performed in Kansas. ECF No. 25-4 at 3.  Its bank account, which paid Taber for his work on the

13 Screw Project, was located in Kansas. *Id.*; ECF No. 31 at 9.  Its employees and manager

14 conducted a meeting in July 2013 establishing the budget for the Screw Project in office space in

15 Kansas claimed by its manager to be Exemplar Holdings' office. ECF Nos. 25-2 at 2; 31 at 10.

16 Though Exemplar Holdings did not lease space in Exemplar Wealth Management's Kansas

17 office, nor give any public notice it conducted business there, it still was conducting business

18 there. ECF No. 31 at 18.

19        Taber acknowledges that Exemplar Holdings was doing business from 2013 to 2017

20 because that was when he was employed by it, so it must have had a principal place of business

21 somewhere during that time.  Taber does not allege it was California, where he was working on

22 the Screw Project, nor wherever Moore was working on the Screw Project.  Instead, Kansas is

23 the only state that Exemplar Holdings had sufficiently continuous and systematic affiliations

20

1 with to establish a principal place of business for general jurisdiction.  Indeed, Taber, as one of

2 Exemplar Holdings' very few employees, acknowledged in different pleadings and discovery

3 that the July 2013 budget meeting happened "at the office address of Defendant in Olathe,

4 Kansas" and that Exemplar Holdings had an office in Olathe, Kansas "[a]t all times material

5 herein." ECF Nos. 25-6 at 5; 1 at 2.

6        Taber further argues that Exemplar Holdings cannot have its principal place of business

7 in Kansas because Exemplar Holdings admits it never filed with the Kansas Secretary of State to

8 do business in Kansas. ECF No. 33-1 at 17.[6]  While this may mean that Exemplar Holdings

9 never properly set up to do business in Kansas, that does not change the fact that it was

10 conducting business in Kansas such that its affiliations with the state were continuous and

11 systematic.  The only direct penalty I could find for a foreign LLC doing business in but not

12 registering in Kansas was a bar on bringing suit in Kansas courts. Kan. Stat. Ann. § 17-76,126.

13 Whether an LLC can sue in a state does not lessen its otherwise continuous and systematic

14 affiliations with that state.  The Kansas statute acknowledges that there may be LLCs doing

15 business in Kansas without registering, further supporting that registration is not necessary for an

16 LLC to make the state its principal place of business.  Therefore, Exemplar Holdings is entitled

17 to judgment as a matter of law that its principal place of business was Kansas when its alleged

18 obligation to Taber came due.[7]

19

20

21 _____

22 [6] Taber also argues that Exemplar Holdings never had an agent on which to serve process in
Kansas.  Taber has not provided evidence of this assertion, so I do not consider that as a factor in
determining whether Exemplar Holdings' principal place of business is Kansas.

23 [7] While Exemplar Holdings may not have had a mailing address in Kansas from June 2020 to
July 2023, this fact is irrelevant to determine where Exemplar Holdings resided when its
obligation to Taber came due, which Taber alleges was April 2017. *See* ECF No. 31 at 18.

Because Exemplar Holdings' state of formation (Nevada) and principal place of business (Kansas) are different, I must choose between them for its residence under the Nevada borrowing statute. Both place of formation and principal place of business are equally valid bases for general jurisdiction, so the justification behind *Lewis'* and *Wing's* holdings does not provide a guide for choosing between them for where an LLC resides. *Daimler AG,* 571 U.S. at 137. The answer cannot be both. The Nevada borrowing statute necessitates that the defendant reside only in one jurisdiction, or else the statute would lead to the application of more than one statute of limitations. The first factor in determining whether the Nevada borrowing statute applies is if the "cause of action has arisen in another state." NRS § 11.020. The answer to that question would be both yes and no if Exemplar Holdings resides both in Nevada, its place of formation, and Kansas, its alleged principal place of business. The Nevada borrowing statute would be impossible to apply in that scenario.

Other Supreme Court of Nevada cases provide some guidance for determining if an LLC resides in its place of formation or principal place of business. When deciding which Nevada county a Nevada-incorporated entity resides in for purposes of venue in state court, the Supreme Court of Nevada decided that a corporation's residence is "the principal office or place of business" as listed "in official documents on file" with the Nevada Secretary of State. *Flournoy v. McKinnon Ford Sales*, 520 P.2d 600, 601-02 (Nev. 1974).

The Supreme Court of Nevada later extended this holding for defining residency in another state statute. *Liberty Mutual v. Thomasson* considered where a foreign corporation with its headquarters in Massachusetts but with an office in Nevada resided under the statute establishing judicial review of state administrative proceedings, NRS § 233B.130. 317 P.3d 831, 835 (Nev. 2014). Applying *Flournoy's* reasoning, it decided that under NRS § 233B.130, "a

1 corporation's place of residence is that which is listed as the principal place of business in its

2 articles of incorporation." *Id*. at 836.

3        It is reasonable to predict that the Supreme Court of Nevada would apply *Flournoy* and

4 *Liberty Mutual* to Nevada's borrowing statute and hold that a corporation's residence is its

5 principal place of business listed in its filings with the Nevada Secretary of State.[8]  It is further

6 reasonable that the Supreme Court of Nevada would extend that holding to LLCs, because LLCs

7 and corporations are treated identically for general jurisdiction, the basis for a cause of action

8 arising where the defendant resides under the borrowing statute. *Impossible Foods Inc. v.*

9 *Impossible X LLC*, 80 F.4th 1079, 1086 (9th Cir. 2023) (applying to an LLC the holding of

10 *Daimler AG*, 571 U.S. 117, that "general jurisdiction is paradigmatically appropriate in the state

11 in which the entity is incorporated or where it maintains its principal place of business"); *Lewis*,

12 63 P. at 127.

13        But it is also reasonable that the Supreme Court of Nevada would not extend *Flournoy*

14 and *Liberty Mutual* to the Nevada borrowing statute.  *Flournoy* was not deciding a corporation's

15 residence between its place of incorporation and principal place of business, because both were

16 in Nevada. 520 P.2d at 601.  Instead, it was deciding in which Nevada county the corporation

17 resided: the county where it does business or where its principal office is. *Id.* at 601-02.  *Liberty*

18 *Mutual* extended *Flournoy's* holding that a corporation's residence is its principal place of

19 business to a corporation incorporated outside of Nevada. 317 P.3d at 835-36.  But *Liberty*

20 *Mutual* did not specifically find that the corporate party resided in the foreign state where its

21 headquarters was located. *Id.* at 835.  Instead, the Supreme Court of Nevada held that, because

22

23

---

[8] No party has submitted Exemplar Holdings' filings with the Nevada Secretary of State.  So it is unclear whether such filings, if they exist, identify a principal place of business here.

the corporate party was incorporated outside of Nevada, it did not have a fixed residence in any Nevada county. *Id.* at 836. This holding was borne of the fact that the *Liberty Mutual* court was deciding which Nevada county, if any, the corporate party resided in for the purposes of the applicable statute. *Id.* at 832. Generally though, because both cases attempt to answer which (if any) Nevada county a corporation resides in, not what state it resides in, they have limited application to the question of the state of corporate residency under the Nevada borrowing statute.

The policy behind the borrowing statute does not help me reach an answer in this case. When analyzing the Nevada borrowing statute, the Ninth Circuit noted that borrowing statutes were passed to preclude "citizens of states with shorter limitations periods to sue in states with longer periods." *Flowers*, 310 F.3d at 1123. This supports Exemplar Holdings' assertion that Taber, as a non-Nevada citizen, should not be able to apply Nevada's six-year statute of limitations to his claim. But the plaintiff's residency is only one element of the Nevada borrowing statute. NRS § 11.020. When the cause of action arises in Nevada, the Nevada statute still applies despite an out-of-state plaintiff. *Id.* Therefore, the question of whether Nevada's borrowing statute applies here still turns on where Taber's cause of action arose: where Exemplar Holdings resides.

> ### 2. *The parties' cited sources for deciding where an LLC resides do not answer the question.*

The parties suggest answers as to where an LLC resides under the Nevada borrowing statute, but their cited materials do not resolve the question. Taber cites a law review article as support that a corporation resides in its state of incorporation, not its principal place of business. The article, which was published about 25 years before the Supreme Court's decision in *Daimler*

24

1  *AG* provided clarity to the law of general jurisdiction, examines the theory and rationales of

2  general jurisdiction. Lea Brilmayer, et al., *A General Look at General Jurisdiction*, 66 Tex. L.

3  Rev. 721, 723 (1988).  When examining general jurisdiction over corporate entities, the article

4  states that "the decision to incorporate in a particular state provides a more powerful basis for

5  adjudicatory jurisdiction than does domicile" and gives several reasons for this conclusion. *Id.* at

6  733-34.  Taber argues that because place of incorporation is a strong basis for general

7  jurisdiction, and because basing where a cause of action arises on a defendant's residency is

8  grounded on a theory of general jurisdiction, place of incorporation is where a corporate

9  defendant resides.  However, since this law review article was published, the Supreme Court

10  decided *Daimler AG*.  *Daimler AG* does not propose or imply that place of incorporation is a

11  stronger basis for general jurisdiction than principal place of business but rather holds that both

12  are equally valid for obtaining general jurisdiction over a corporate entity. 571 U.S. at 137.

13  Supreme Court jurisprudence and its implications carry significant weight when predicting how

14  the Supreme Court of Nevada would decide an issue.  Therefore, Taber's cited law review article

15  is not convincing in resolving this issue.

16      Exemplar Holdings cites four cases supporting the proposition that a corporate entity

17  resides at its principal place of business.  In *Blank v. Ness*, the court was determining where

18  venue was proper where one defendant was a person residing in Louisiana and the second

19  defendant was a company incorporated in Texas with its principal place of business in Louisiana.

20  Civil No. JKB-16-3735, 2018 WL 1399812 at *3 (D. Md. Mar. 20, 2018).  The *Blank* court

21  noted that "venue may have … been proper in Louisiana … due to the residencies of

22  Defendants," which Exemplar Holdings argues is further proof that a corporate entity resides in

23  its principal place of business. *Id.*  But *Blank* was determining residency under the federal venue

1   statute, which states that an entity "shall be deemed to reside, if a defendant, in any judicial

2   district in which such defendant is subject to the court's personal jurisdiction." 28 U.S.C.

3   § 1391(c)(2). For venue purposes, a corporate entity resides both in its place of incorporation

4   and principal place of business because it is subject to general jurisdiction in both locations.

5   Therefore, *Blank* does not stand for the proposition that corporate entities reside at their principal

6   place of business and not in their place of incorporation.

7        The other three cases Exemplar Holdings cites analyze New York's borrowing statute.

8   *EMC Mortgage LLC v. Pulte Mortgage LLC,* 441 F. Supp. 3d 1140, 1151 (D. Colo. 2020);

9   *Woori Bank v. Merrill Lynch,* 923 F. Supp. 2d 491, 495 (S.D.N.Y. 2013); *McMahan & Co. v.*

10  *Donaldson, Lufkin & Jenrette Securities Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989). Under

11  New York's borrowing statute, a business entity's residence "is determined by its principal place

12  of business." *EMC Mortgage LLC,* 441 F. Supp. 3d at 1151; *Woori Bank*, 923 F. Supp. 2d at

13  495; *McMahan & Co.*, 727 F. Supp. at 834. But New York's statute is distinguishable from

14  Nevada's because under New York's borrowing statute, the cause of action for an economic

15  injury usually arises where the plaintiff resides because that is the place of injury. *EMC*

16  *Mortgage LLC,* 441 F. Supp. 3d at 1151; *Woori Bank*, 923 F. Supp. 2d at 495; *McMahan & Co.*,

17  727 F. Supp. at 834. New York's statute thus considers the plaintiff's residence, not where the

18  defendant can be sued. Therefore, these three cases have limited application to interpreting

19  Nevada's borrowing statute.

20       Nevertheless, New York is the only other state I found that determines the place where

21  the cause of action arises based on the residence of either party. In several other states, the

22  residence of one or either party is a consideration before applying a borrowing statute, but none

23  connects residence to where the cause of action arises like Nevada's or New York's. These

states come to different conclusions on whether an entity resides in its place of formation or principal place of business.  For example, Iowa's borrowing statute applies a foreign jurisdiction's statutes of limitations if the defendant resides in a foreign jurisdiction and that jurisdiction's statutes of limitation bars the action. Iowa Code § 614.7.  This is a separate element from where the cause of action arises. *See id.*; *Sedco Intern., S.A. v. Cory*, 522 F. Supp. 254, 315-16 (S.D. Iowa 1981).  When determining where a corporation resides under the Iowa borrowing statute, courts find that they reside at the principal place of business. *See Drudge v. Overland Plazas Co.*, 531 F. Supp. 210, 212 (S.D. Iowa 1981).  In Illinois, a prerequisite to applying its borrowing statute is that none of the parties is an Illinois resident. *Telular Corp. v. Mentor Graphics Corp.*, 282 F. Supp. 2d 869, 871 (N.D. Ill. 2003).  That element is unrelated to the determination of where the cause of action arises under the Illinois borrowing statute. *See id.* at 871-72.  Under the Illinois borrowing statute though, a corporation resides in its state of incorporation. *Id.* at 872.  Theses differing conclusions show the difficulty of using other states' interpretations of their borrowing statutes to interpret Nevada's.

Exemplar Holdings additionally argues that because all of the key facts occurred in either Kansas or California and nothing relevant to the case occurred in Nevada, Nevada cannot be where the cause of action arose.  This argument is unavailing because the events related to the claim were not relevant to the Supreme Court of Nevada's determination of where the cause of action arises under the Nevada borrowing statute. *See Lewis,* 63 P. at 127.  Only the defendant's residence matters. *Id.*; *Wing*, 223 P. at 336.

        3.  *I certify the question to the Supreme Court of Nevada.*

For the reasons discussed above, I hesitate to predict whether the Supreme Court of Nevada would decide that an LLC's place of incorporation or its principal place of business is its

1   residence under the Nevada borrowing statute.  "When state law issues are unclear, [I] may

2   certify a question to a state's highest court to obtain authoritative answers." *Potter v. City of*

3   *Lacey*, 46 F.4th 787, 791 (9th Cir. 2022) (quotation omitted).  Certification may be appropriate

4   for state law issues that carry "significant policy implications" and "will have broad application."

5   *Id*. (quotation omitted); *Kremen v. Cohen*, 325 F.3d 1035, 1038 (9th Cir. 2003).  Nevada Rule of

6   Appellate Procedure 5 permits me to certify a question of Nevada law "which may be

7   determinative of the cause then pending" in my court when "it appears to [me] there is no

8   controlling precedent in the decisions of the Supreme Court or Court of Appeals of [Nevada]."

9   The certified question does not have to resolve or conclude the entire case; it only needs to be

10  "determinative of part of the federal case." *See Volvo Cars of N. Am., Inc. v. Ricci*, 137 P.3d

11  1161, 1164 (Nev. 2006) (en banc) (quotation omitted).

12          The application of statutes of limitations against entities incorporated or formed in

13  Nevada has broad implications for the state and should be left to the state court.  There is no

14  clearly controlling Nevada precedent.

15           The answer of where an LLC resides is determinative of this case, even though Exemplar

16  Holdings moves for summary judgment on an additional ground.  Exemplar Holdings also argues

17  that, even if Nevada's six-year statute of limitations applies, the agreement between it and Taber

18  is an installment contract.  As an installment contract, the statute of limitations for each

19  individual payment Exemplar Holdings owed Taber would start running on the day the payment

20  was due. *Clayton v. Gardner,* 813 P.2d 997, 999 (Nev. 1991) (per curiam); *Bongiovi v. Bongiovi*,

21  579 P.2d 1246, 1247 (Nev. 1978) (per curiam).  Therefore, it argues that the only payments that

22  are not barred by the statute of limitations are those that came due within six years of Taber

23  filing his complaint on April 28, 2023.  It concedes though that under its installment contract

theory at least one $7,500 payment is within Nevada's six-year limitations period: the payment that Taber's invoice states was "Due" on May 1, 2017. ECF No. 1 at 11.  Therefore, even if I decide that the parties' agreement is an installment contract, I still must decide whether Nevada's borrowing statute would apply Kansas' five-year statute of limitations against the claim for the May 1, 2017 payment.  Consequently, I cannot resolve this motion for summary judgment without determining where Exemplar Holdings resides under Nevada's borrowing statute.[9]

Therefore, by separate order I will certify the following questions to the Supreme Court of Nevada:

Under the Nevada borrowing statute, NRS § 11.020, where does a cause of action on an obligation against an LLC arise?  More specifically, does an LLC reside in its place of formation or principal place of business under the Nevada borrowing statute?

In the interim, I partially grant Exemplar Holdings' objection to Magistrate Judge Weksler's recommendations.  I modify her order to grant in part and deny without prejudice in part Exemplar Holdings' summary judgment motion and to deny without prejudice Taber's partial summary judgment motion.  The parties may refile summary judgment motions within 30 days of the Supreme Court of Nevada's decision on the certified question.

/ / / /

/ / / /

/ / / /

---

[9] Exemplar Holdings further argues that it is entitled to summary judgment that this agreement is an installment contract because the evidence Taber presents on this point contradicts his sworn responses to Exemplar Holdings' interrogatories.  Exemplar Holdings argues such contradictory evidence cannot create a genuine issue of material fact under the sham affidavit rule.  Even if I rule for Exemplar Holdings on such reasoning, there still would be one payment allegedly due to Taber within Nevada's six-year statute of limitations, necessitating an answer to the borrowing statute issue.

**D.  I modify Magistrate Judge Weksler's recommendations to deny without prejudice Exemplar Holdings' summary judgment motion that the alleged agreement is an installment contract.**

As discussed above, I must determine whether to apply Nevada's borrowing statute to apply Kansas' statute of limitations to the May 1, 2017 payment no matter how I rule on the question of whether the alleged agreement is an installment contract.  It is possible that the Supreme Court of Nevada's decision on the certified question would moot a ruling on the installment contract issue.  If the Supreme Court of Nevada finds that an LLC resides at its principal place of business, such that Exemplar Holdings resides in Kansas, Kansas' 5-year statute of limitations would bar Taber from recovering anything on his complaint, no matter if his employment agreement was an installment contract or not.  In that situation, ruling whether Taber's employment agreement was an installment contract would be an advisory opinion.  I thus decline to rule on the installment contract issue at this time.  I partially grant Exemplar Holdings' objection to Magistrate Judge Weksler's recommendations by modifying her order to deny without prejudice Exemplar Holdings' motion for summary judgment on the installment contract issue.  It may refile its motion on that issue within 30 days of the Supreme Court of Nevada's decision on the certified question, if necessary.

**IV.    CONCLUSION**

I THEREFORE ORDER that defendant's motion for leave to file a reply in support of its objection to Magistrate Judge Weksler's recommendations **(ECF No. 44) is DENIED**.

I FURTHER ORDER that defendant's objection to Magistrate Judge Weksler's recommendations **(ECF No. 39) is GRANTED IN PART**.  I **DENY** with prejudice defendant's summary judgment motion **(ECF No. 25)** as to the written instrument issue and defendant's

30

objection **(ECF No. 39)** that Nevada's six-year statute of limitations had already run when Taber filed his complaint from when testable screws were produced. I **MODIFY** Magistrate Judge Weksler's recommendations to **GRANT in part** defendant's summary judgment motion **(ECF No. 25)** as to Exemplar Holdings' location of its principal place of business and find that it was Kansas. I also **DENY in part** without prejudice the recommendation on defendant's summary judgment motion **(ECF No. 25)** as to the borrowing statute and installment contract issues. I **MODIFY** Magistrate Judge Weksler's recommendations to **DENY** without prejudice plaintiff's motion for partial summary judgment **(ECF No. 33)**.

The parties may file new motions for summary judgment as to the application of the Nevada borrowing statute within 30 days of the Supreme Court of Nevada's decision on the certified questions. The defendant may file a new motion for summary judgment as to the installment contract issue within 30 days of the Supreme Court of Nevada's decision on the certified questions.

DATED this 2nd day of December, 2025.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE